Nader Mobargha, Esq.
Alison S. Moss, Esq.
BEYS LISTON & MOBARGHA LLP
641 Lexington Avenue, 14th Floor
New York, New York 10022
(646) 755-3603
nmobargha@blmllp.com
amoss@blmllp.com
*Attorneys for Defendant-Appellant Azadeh Nasser Azari*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AZADEH NASSER AZARI,<br><br>                    Appellant,<br><br>    v.<br><br>WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br><br>                    Appellee. | Case No. 1:22-cv-10486-AT |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT-APPELLANT AZADEH NASSER AZARI'S MOTION UNDER FEDERAL BANKRUPTCY RULE 8004, 28 U.S.C.§ 158 AND 28 U.S.C. § 1292(b) FOR LEAVE TO <u>APPEAL FROM AN INTERLOCUTORY ORDER</u>**

**Table of Contents**

PRELIMINARY STATEMENT……………………………………………………………………….1

ADDITIONAL BACKGROUND AND UNDISPUTED FACTS……………………………….4

ARGUMENT………………………………………………….………………………....11

    I.    DEBTOR FAILS TO PROVIDE ANY COGENT ARGUMENT IN OPPOSITION TO AZARI'S MOTION FOR LEAVE TO APPEAL FROM AN INTERLOCUTORY ORDER……………………………………………………….11

        A.  The Issue For This Interlocutory Appeal Is A Pure Question Of Controlling Law Which Could Result In Dismissal And Termination Of The Litigation…...…….11

        B.  Debtor Has Failed To Cite A Single Case That Is Remotely Analogous To This Action………………………………………………………………………….14

CONCLUSION………………………….…………………………………….…………………15

## **Table of Authorities**

*In re Extended Stay, Inc.*, No. 09-13764 (JLG), 2020 WL 10762310
 (Bankr. S.D.N.Y. Aug. 8, 2020)……………………………………………………12

*In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897
 (Bankr. S.D.N.Y. Oct. 1, 2013)…………..…………..………..……........................12

*Madison Equities, LLC v. Condren*, 385 B.R. 511 (Bankr. S.D.N.Y. Apr. 11, 2008)………..12,13

*W.R. Huff Asset Mgmt. Co., LLC. v. Deloitte & Touche, LLP, et al.*,
 549 F.3d 100 (2d Cir. 2008)………………………………………………………...12

Defendant-Appellant Azadeh Nasser Azari ("Azari") submits this reply memorandum of law in further support of her motion under Federal Bankruptcy Rule 8004, 28 U.S.C. § 158, and 28 U.S.C. § 1292(b) (the "Motion") and in reply to Debtor's opposition to Azari's Motion (the "Opposition" or "Opp.").

## PRELIMINARY STATEMENT

1. In its Opposition, Debtor fails to refute, in any sensible way, Azari's satisfaction of the three (3) elements required for leave to appeal from an interlocutory order. Rather, Debtor spends most of its Opposition attempting to distract the Court with its habitual smoke and mirrors tactic of reciting "facts" that not only are irrelevant to the motion, but already have been flatly rejected by the First Department in its 5-0 decision in favor of Azari in the First Action.[1] Nevertheless, in its desperate attempt to taint court proceedings, Debtor continues to resurrect these rejected allegations. The bankruptcy court even warned Debtor not to waste its resources or the Court's time with these rejected allegations from the First Action, but Debtor still refuses to heed any of its directives. It now has a new audience in the district court, and a new opportunity to mislead this court as it has done with previous state and bankruptcy courts.

2. This pattern has persisted for the past six (6) years by both Debtor – or more accurately, Golsorkhi, its President and sole individual managing director and decision-maker – and its counsel, Blank Rome LLP. Their tactics do not just involve resurrecting rejected allegations, but also filing knowingly false claims, perjuring themselves, and hiding facts from the bankruptcy court. Their conduct has proven so egregious that it has resulted in a joint motion for sanctions against Debtor and Blank Rome filed by Azari and 29 Beekman Corp., another litigant in a separate adversary proceeding against Debtor unconnected to this Action.

---

[1] All capitalized terms in this reply memorandum have the same meaning as in the Motion.

1

Remarkably, it also has resulted in a $500,000 settlement by Blank Rome with the United States Trustee to resolve the law firm's intentional failure to disclose material facts to the bankruptcy court in an application for approval of its retention as special counsel for Debtor.[2]

3.  Turning to the actual merits of Azari's Motion, Azari has shown that she satisfies all three required prongs for an interlocutory appeal. First, the disposition of an appeal concerning Debtor's right to assert an action on behalf of creditors is a controlling question of standing under Article III of the Constitution that would result in dismissal of the Action. After all, Debtor has no right to continue litigating the Action if the Second Circuit holds that it had no right to file it in the first place. Second, it is undisputed that the issue presented – namely, whether a solvent debtor at the time of its bankruptcy petition has the right to refrain from paying its creditors and instead litigate purportedly on their behalf, thereby unnecessarily diminishing the capital in the estate – is one of first impression. Third, since the disposition of the appeal would result in dismissal of the Action, it also would advance the termination of the litigation. Debtor has no real answers to this straightforward three-prong analysis.

4.  First, Debtor argues that the appeal concerns a mixed question of fact and law requiring an extensive review of the record, and thus is not appropriate for an interlocutory appeal. This is patently false. This is a straightforward legal issue concerning whether the bankruptcy court only needs to identify one unsecured creditor with an allowable claim on Debtor's schedule, or whether it also must determine whether an action would benefit *all* the creditors listed on the schedule, in the aggregate, as Second Circuit case law requires. Furthermore, there is no factual issue concerning Debtor's solvency ***at the time of the petition*** – the relevant time to determine whether an avoidance action by a DIP would benefit the creditors

---

[2] The joint sanctions motion by Azari and 29 Beekman Corp. is still pending before the bankruptcy court.

– and Debtor has not identified any.  At the time of the petition, in October 2019, it is undisputed that Debtor was solvent since, mathematically, Debtor's assets were $10.3 million, and its liabilities were $10.03 million.  Even the bankruptcy court did not claim there was a factual dispute about this issue.  As such, all the Court has to do is take judicial notice of (i) Debtor's publicly-filed schedule of assets and liabilities and (ii) Debtor's real estate contract to sell its primary asset for an amount exceeding the liabilities in its schedules, which also was publicly filed with its petition.

5. <u>Second</u>, this case is one of first impression.  This fact is evident in that Debtor has failed to cite a single bankruptcy decision in the United States in which a solvent Debtor filed an adversary proceeding on behalf of creditors, while also admitting that all unsecured creditors are "unimpaired" or are not suffering any financial injury.  Furthermore, contrary to Debtor's claim, this issue is "particularly difficult" since it requires the Court to consider both a DIP's power as a trustee with the authority to act on behalf of creditors, and the interests of the very creditors the DIP is purporting to represent.  Here, Debtor's use of its avoidance power is perverse since it intentionally tramples on the rights of creditors it is purportedly representing by filing an admittedly unnecessary action on the creditors' behalf to their detriment and for the benefit of Debtor's sole insider, Golsorkhi, and its law firm, Blank Rome.  Indeed, at the 341 Creditor Meeting in bankruptcy and in his deposition, Golsorkhi, who is in sole control of Debtor, admitted this entire Action was only for his personal benefit and that the creditors had nothing, or very little, to do with his litigation decision. (*Motion,* ¶¶ 43-44).  Debtor seems incapable of taking its own words under oath at face value.

6. <u>Third</u>, Debtor fails to address the undisputed fact that, if the Second Circuit Court of Appeals decides the appeal in Azari's favor, the <u>entire</u> Action would be dismissed and the litigation would terminate since there would be no further issues to resolve.

7. For all the foregoing reasons, the Court should grant Azari's motion for leave to appeal from an interlocutory order. Azari is defending the right to her undisputed pension for the ***third*** time in this Action, which has been part of a six-year litigation campaign by Golsorkhi to deprive her of this pension. Taking a step back, Golsorkhi, the sole decision-maker of Debtor, is the same executive who (i) made the promises to Azari about her pension and admitted she relied on these promises; (ii) memorialized those terms in an affidavit and signed the Judgment in Azari's favor; (ii) unsuccessfully attempted to renege on his own sworn written statements in pre-bankruptcy state court litigation; (iii) filed bankruptcy for the <u>sole</u> purpose of challenging Azari's admitted pension for the third time and for his own benefit; and (iv) filed this Action purportedly on behalf of creditors, while admitting that these very creditors would have received one hundred (100) cents on the dollar without litigation. Contrary to Debtor's claim, this is one of the most "exceptional" abuses of the bankruptcy system and a DIP's trustee powers to date. (*Opp.* ¶ 43). As such, Azari should be afforded the right to appeal this limited issue and potentially put this litigation to rest once and for all without expending additional resources.

## ADDITIONAL BACKGROUND AND UNDISPUTED FACTS

8. Debtor's irrelevant recitation of facts in its Opposition for the sole purpose of misleading the Court has left Azari with no choice but to refute them despite their irrelevance to her Motion. These additional facts also confirm the "exceptional" circumstances of this Action.

**I- The Oral Contract Between Debtor And Azari Concerning Her Pension And The Judgment's Satisfaction Of That Obligation**

9. As confirmed by the Judgment, the terms of the oral contract between Debtor and Azari were as follows: Azari would remain an integral employee of Debtor until the death of the Princess, which Debtor solely served. In exchange for devoting her life to Debtor and foregoing any other employment for decades, Debtor would provide Azari a pension so that she could at least maintain her same standard of living for the estimated remaining twenty-five (25) years of her life. This length of time was based on the median age of the life of her parents (eighty-six (86) and ninety-one (91)), plus five (5) years to factor the longer life spans of successive generation. (*See Reply Declaration of Nader Mobargha ("Mobargha Declaration"), Esq. Ex. 1, Azari Depo Tr. 91:11-14*).[3] Oral agreements were the way Debtor conducted business and Debtor admitted that all of its oral agreements are enforceable. (*Motion,* ¶¶ 26-27).

10. Azari hired two experts who have produced reports, each of which concludes that the fair value of Azari's pension for her thirty-seven (37) years of employment with Debtor is (i) $2,457,452 and (ii) between $2,102,681 and $2,613,197, respectively. One of those experts also conducted an actuarial analysis and concluded that Azari could live well beyond twenty-five (25) years. He also presented a discounted cash flow analysis, even though such analysis is not appropriate since, to date, Azari has never received any cash for her Judgment. In contrast, Debtor, who has the burden of proof, failed to hire *any* expert during discovery or produce any expert report. As such, Debtor's citation to Judge Bernstein's crude pre-discovery comments on the likely short span of Azari's life or about the calculation of Azari's pension are irrelevant. (*Opp.,* ¶ 20).

11. Debtor and Golsorkhi's purpose in signing the Judgment and having it filed was to provide Azari security for her pension in the form of a lien on Debtor's primary asset, the

---

[3] All exhibit references in this reply memorandum are attached to the Mobargha Declaration.

5

Townhouse. This was especially important since her pension was supposed to be a replacement for a 401K plan (*Motion,* ¶ 21). Golsorkhi was familiar with confessions of judgment as he had been a party to one years earlier. (*Ex. 2, 1999 Affidavit of Confession of Judgment*).

12. The Judgment was a long-term expense and Debtor's obligation to satisfy the Judgment was triggered only once Debtor sold the Townhouse and ended Azari's employment. (*See Azari v. Wansdown*, 652137/2016, ECF No. 4)(Notice of Entry of Judgment served after Azari's employment). Debtor never attempted to pay the Judgment out of the funds earmarked for the payment of its everyday expenses and admitted that the Judgment did not affect "[Debtor's] ability to pay its bills on a daily basis…" (*Ex. 3, GRG Day 1, Dep. Tr. 125:18-126:10*).

13. Contrary to Debtor's claim, all relevant parties knew about Azari's pension, as confirmed by letters and emails. Golsorkhi and Azari collaborated on a letter to inform the recently appointed board members of Pelmadulla, Debtor's sole shareholder, about Azari's pension. (*Ex. 5, Dec. 15, 2015 Azari letter to A. Kerman*). In response, Abdolreza Ansari, a Pelmadulla board member, urged that Azari's pension be treated with the "utmost generosity…commensurate with the tradition of a royal household." (*Ex. 6, Dec. 21, 2015 Email Chain*). Finally, even after Golsorkhi signed the Judgment and it was filed, he confirmed the terms of the promises and the pension in an email to Pelmadulla's new legal adviser. (*Ex. 7, Apr. 18, 2016 Email, at AA100,* last ¶ *and AA101,* 4th ¶).

**II- Debtor And An Affiliate Collaborate To File Knowingly False Actions To Renege On Debtor's Own Promises And Signed Judgment**

14. Despite Debtor's sworn admission that it owed Azari the Judgment, and its sworn statements authorizing her to file the Judgment, Debtor – and an affiliate with whom it frequently corresponded with about the Judgment – collaborated to file the First and Second

Actions to vacate the Judgment, both of which were based on knowingly false allegations. (*Motion,* ¶ 9).

15. In the First Action, Debtor alleged that Azari engaged in "misconduct" in the execution of the Judgment. Specifically, Debtor alleged that Azari took advantage of Golsorkhi knowing that he was not a "native English speaker" who did not understand the plain terms of the affidavit. (First Action, ECF No. 1, ¶ 6). However, this was a lie since Golsorkhi received an undergraduate degree and MBA from American universities, and attended secondary school in the United Kingdom and the United States. (*Ex. 3*, *12:25-14:6*). Not only does Golsorkhi have a "mastery of the English language," but English is his *only* fluent language.[4] (*Ex. 3, 12:10-24; 136:16-18*).

16. Also in the First Action, Golsorkhi claimed that he did not have the authority to sign the Judgment. As Debtor's Articles of Incorporation and Debtor's filed resolution in the bankruptcy court confirm, Golsorkhi "is authorized, empowered, and directed with full power of delegation, to negotiate, execute, deliver, file, and perform, in the name and on behalf of [Debtor]…." (*Ex. 8, Oct. 7, 2019 Resolution of Debtor, pg. 1*).

17. In the First Action, Debtor also made the same additional and meritless arguments that it chose to include in its Opposition. They include that Azari and "her son and attorney" drafted the Judgment, which Golsorkhi somehow signed "under pressure", and that Golsorkhi was "not an attorney and unsophisticated when it came to legal matters." (*Opp.,* ¶¶ 18-19). The First Department unanimously rejected these identical and unsupported allegations and held that "the misconduct alleged in the complaint is not the sort of misconduct that would warrant

---

[4] A cursory review of the numerous affidavits that Golsorkhi has filed in the bankruptcy only further confirms the absurdity of his claim that he does not understand the plain English terms of a simple affidavit.

vacating the judgment," and that a judgment by confession "has all the qualities and incidents and attributes of a judgment on verdict, including a presumption of validity." (*Ex. 9, Oct. 23, 2018 First Dep't Decision in First Action*, at 22).

18.  In the Second Action, Kamran Abbas-Vahid, an affiliate of Debtor, alleged "fraud and collusion" between Azari and Golsorkhi.  These allegations were patently false since they contradicted Debtor's allegations in the First Action that Golsorkhi was a victim who could not understand the plain English terms of his own affidavit.  Golsorkhi cannot simultaneously be a victim immigrant with limited language skills and a co-conspirator and mastermind who drafts the Judgment.

**III-    Debtor Filed Bankruptcy For The Sole Purpose Of Avoiding Azari's Judgment**

19.  After both the fraudulent First and Second Actions were dismissed, on October 8, 2019, Debtor – or more accurately Golsorkhi – filed bankruptcy for the sole purpose of seeking a third attempt to void Ms. Azari's pension.  (*Ex. 10*, *25:20-26:9*)(There was "no other reason[ ]" given to potential purchaser 29 Beekman Corp for filing bankruptcy except to "contest the Judgment…in bankruptcy court rather than in state court.").  Since Debtor and Golsorkhi had run out of plaintiffs to sue Azari, Debtor this time filed an avoidance action under section 544(b) as a DIP purportedly acting on behalf of creditors.  However, the creditors did not stand to benefit from the Action since Debtor was solvent, and litigation could only diminish, not increase, what they ultimately would receive. (*Motion,* ¶¶ 4, 46, 51-52).

**IV-    Debtor's Allegations Of Insolvency Are Belied By The Record**

20.  To prevail in this avoidance Action, Debtor must prove that, in February 2016, the date when it signed the Judgment, it was insolvent.  The undisputed record shows otherwise.

8

21. In or around February 2016, Debtor was winding down its business and was seeking to liquidate its primary asset, the Townhouse, and shut its doors. (*Ex. 3, 78:25-79:4*).

22. At that time, Debtor projected $34 million in proceeds from the sale of the Townhouse. Indeed, Debtor not only created projections for the sale of its Townhouse at this price, but it also signed a broker agreement with Halstead to list the property for this amount, which was based on the sale of comparable properties, including one located on the same block. (*See Ex. 11, Mar. 9, 2015 Email w/ Projections; Ex. 12, Mar. 1, 2016 Halstead Agreement; Ex. 17, Halstead Valuation*).

23. Debtor also conducted an appraisal of the Townhouse – an alternative type of valuation – which confirmed a value of at least $18 million for the Townhouse. (*See Ex. 13, Vanderbilt Appraisal*).

24. Azari hired an expert and subpoenaed Halstead to confirm these valuations. In contrast, Debtor, despite having the burden, did not produce any expert reports on the value of the Townhouse or produce a single witness to contradict its own projections or valuations.

25. Furthermore, Debtor admitted its liabilities were only $7.7 million at the time, which includes the $2.7 million Judgment and Debtor's $5 million mortgage. As such, Debtor was solvent at either a $34 million or $18 million valuation.

26. Finally, it is undisputed that, in February 2016, Debtor had $2 million in cash on hand from a February 2016 extension of its mortgage. As Debtor admits, it used $330,000 of that amount to pay all its bills, leaving $1.7 million in reserve to pay all future bills until it sold the Townhouse. (*Opp., ¶ 24*). Debtor could have rented the Townhouse to earn even additional income, but decided not to do so.

9

27. During the next three-and-one-half years, Debtor received no less than five (5) written offers for the Townhouse ranging between $37 million and $17 million, and even entered into a contract for $17 million with one buyer. (*Ex. 4, at 89:3-16; Ex. 14, Dec. 18, 2019 Contract*).[5] This range matched both Halstead's valuation and the appraisal. Debtor rejected or failed to follow up with any of these offers, and refused to close on the $17 million contract, instead choosing to litigate with the buyer to relieve itself of its contractual obligation.

28. Remarkably, even years after it rejected these offers, when Debtor filed for bankruptcy, it admitted that it was solvent and could pay the claims of all its creditors in full. (*Motion,* ¶¶ 34-41).

29. There is not a single bankruptcy precedent in the United States that would support Debtor's claim of "insolvency" under these facts, or its claim that the Judgment caused Debtor's insolvency in any way. Debtor's claim is especially ludicrous since, subsequent to signing the Judgment, Debtor continued to reject offer after offer, any one of which would have netted Debtor a windfall. Even the bankruptcy court expressed skepticism over Debtor's claim of insolvency:

> Is it really plausible to assume or infer…that Golsorkhi gave an affidavit of confession of judgment for $2.7 million on behalf of Debtor, believing that Debtor would not be able to pay it? Do you think that that's a plausible inference?…Isn't it more plausible that Debtor intended to sell the [Townhouse] because the Princess passed away? Debtor thought it would be able to sell it and pay off all the debts. (*Ex. 15, Apr. 14, 2020 Tr., 25:24-26:3, 26:18-21*).

30. The Court also rejected Debtor's latest theory – which Debtor curiously never raised in the First Action – that Azari was not supposed to file the Judgment, but rather use it for "negotiating leverage." (*Opp.,* ¶ 19). The Court specifically indicated "that is not what the

---

[5] Due to their irrelevancy to this Motion, Azari has not attached all five (5) written offers, but only Golsorkhi's admissions about them.

10

Judgment says." Rather, the Judgment explicitly states, "in the last paragraph that it's immediately recorded." (*Ex. 15, at 25:8-17*). Undeterred, Debtor raises the rejected argument again with this Court in its never-ending campaign to repeatedly relitigate the same issues. Debtor has taken so many bites at the apple that it has swallowed its core whole.

## ARGUMENT

### I- DEBTOR FAILS TO PROVIDE ANY COGENT ARGUMENT IN OPPOSITION TO AZARI'S MOTION FOR LEAVE TO APPEAL FROM AN INTERLOCUTORY ORDER

31. In her Motion, Azari established that she satisfies all the requirements for leave to appeal from an interlocutory order. She is seeking to appeal (i) a controlling issue of law which will result in dismissal of the Action if the appeal is in her favor; (ii) concerning an issue that is "particularly difficult and of first impression" which can result in a "substantial…difference of opinion"; and (iii) which will result in the "ultimate termination of the litigation" since Debtor would no longer be permitted to continue litigating its claims. In response, Debtor makes a number of meritless arguments contradicted by its own admissions and schedules, and fails to cite a single case on point.

#### A. The Issue For This Interlocutory Appeal Is A Pure Question Of Controlling Law Which Could Result in Dismissal And Termination Of The Litigation

32. <u>First</u>, Debtor claims that Azari does not satisfy the first and third elements of an interlocutory appeal since the issue is a "mixed question of law and fact", rather than a pure question of controlling law. Debtor claims that these factual issues must be resolved at a trial. (*Opp.*, ¶¶ 45-47). This is patently false.

33. The central issue is whether the bankruptcy court erred when its only analysis in determining whether the Action benefitted creditors was to identify a single unsecured creditor with an allowable claim on Debtor's schedules. Azari contends that this robotic application of

the standing issue was wrong, and the bankruptcy court should have taken its analysis a step further and determined whether the Action – at the time of the petition, or even when it was filed – benefitted the creditors, as the Second Circuit requires.  As such, the issue on appeal is strictly a legal one concerning a bankruptcy court's approach in analyzing a DIP's standing to file an avoidance action under section 544(b) of the Code.  *See e.g., W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP et al.,* 549 F.3d 100 (2d Cir. 2008)(interlocutory appeal on whether an investment manager could bring action on behalf of its clients).

34.     Furthermore, contrary to Debtor's claim, a determination of whether the Action benefitted creditors would not require an extensive review of the factual record.  All the Court would have to do is review Debtor's schedules – which is precisely what the bankruptcy court did – and take judicial notice of Debtor's $10.03 million in liabilities and Debtor's publicly-filed pre-bankruptcy contract for $10.3 million for the sale of its Townhouse, which accompanied its petition.[6]  *See, e.g., In Re Extended Stay, Inc.,* No. 09-13764 (JLG), 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug. 8, 2020)(court may take judicial notice of documents filed in bankruptcy and adversary proceedings); *In re MSR Hotels & Resorts, Inc.,* No. 13-11512 (SHL), 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013)(same); *Madison Equities, LLC v. Condren*, 385 B.R. 511, 520 (Bankr. S.D.N.Y. Apr. 11, 2008)(same).  As a matter of pure mathematics, Debtor was solvent and simply had to proceed to a closing and pay all its creditors.

---

[6] Debtor continuously claims that Azari did not object to the final bankruptcy plan – which was confirmed **nine (9) months** later.  But Azari had no reason to do so.  The time of the petition is when Debtor must assess whether a 544(b) action is viable, not nine (9) months later.  Even the bankruptcy court admitted this in its Decision.  Any debtor can take a solvent corporation into bankruptcy, run up legal fees of $1 to $2 million without justification, and then claim that the creditors, who were "unimpaired" in the initial bankruptcy plan, are "impaired" – almost a year later – due to debtor's unnecessary and unlawful litigation decisions.  That is precisely why the analysis is done at the time of the petition.

35.     As such, it is uncertain what factual issue Debtor is referencing, and Debtor fails to identify any in its Opposition.  Even in its Decision, the bankruptcy court did not claim that Debtor's standing to file an action on behalf of creditors – or Debtor's solvency at the time of the petition – was a factual issue.[7]   Further confirming this appeal does not concern a factual issue, the bankruptcy court did not indicate that the trial would involve any issues concerning Debtor's standing.  That is because the bankruptcy court already conclusively ruled on the issue.

36.     Debtor ignores the undisputed figures on its own schedules and instead dances around its own representations concerning its solvency by claiming that they only concerned "something that would occur in the future if a sale closed" at $10.3 million, the purchase price of the RSA.  (*Opp.,* ¶ 55).  Once again, Debtor ignores basic mathematics.  Debtor's representations concerning the certainty that it could pay creditors "if a sale closed" at $10.3 million would equally apply to the sale that actually ***did close*** at $11.5 million.  Simply put, if you can pay the creditors at $10.3 million, then surely you can pay them at $11.5 million.  This lucrative development for Debtor – selling its primary asset for $1.2 million higher than it anticipated – provides even less of a justification to file this Action.

37.     Debtor's argument is also a red herring since Debtor filed this Action <u>before</u> the potential $10.3 million sale to 29 Beekman Corp. fell apart.  Put differently, Debtor did not even wait to see if the sale would close before filing the Action.  That is because regardless of the sale price of the Townhouse – even if it was for $25 million – Debtor was planning to file this Action on behalf of creditors against Azari.  All the Court has to do is look at Debtor's announcement of this intention when it first filed its petition and its admissions shortly afterwards.  (*In Re*

---

[7] The bankruptcy court only found that there were factual issues regarding whether Debtor was solvent ***at the time of the conveyance*** of the Judgment, not at the time of the petition.  Of course, this was erroneous given the undisputed record.

13

*Wansdown*, 19-13223, ECF No. 5, ¶ 14; *Ex. 3. 187:13-16*)(Debtor "really filed bankruptcy to challenge Azari's Judgment again."); *Ex. 18, Oct. 16, 2019 Email chain from Debtor's counsel* (Debtor's "plan to challenge" the Judgment); *Ex. 19, 341 Creditor Meeting, at 17:8-9* (intention to "object to Azari claim"). Given that Debtor only filed bankruptcy to challenge the Judgment a third time – regardless of the sale price of the Townhouse – the only conclusion is that Debtor filed this Action in bad faith and intentionally to the detriment of the creditors.

      **B.    Debtor Has Failed To Cite A Single Case That Is Remotely Analogous To This Action**

      38.    <u>Second</u>, without citing any analogous case law or providing any analysis to support its position, Debtor tries to argue that Azari does not satisfy the second prong for an interlocutory appeal because she has not shown that this is a case of first impression or one that is "particularly difficult" for the Court of Appeals to resolve. (*Opp.*, ¶¶ 50-57).

      39.    Specifically, Debtor claims that, since one of Azari's arguments is that the bankruptcy court failed to follow Second Circuit case law in *Whiteford Plastics Co. v. Chase Nat'l Bank of New York City,* and *In Re Vintero Corp.* (*Opp.*¶ 51), then, by definition, this case cannot be one of first impression. Azari, however, can cite the general legal principle, as articulated by the Second Circuit, that an avoidance action under 544(b) of the Code must "benefit" the creditors, while also establishing that this case is factually without precedent. Even Judge Bernstein, when first confronted with Debtor's bankruptcy plan in which there were "no impaired classes" of creditors, remarked that this case is "very rare" and one which he "has[n't] seen…in [his] twenty-six (26) years [on the bench]." (*Ex. 16, Dec. 6, 2019 Tr., at 3:22-4:4*). Debtor knows this to be true. Debtor itself has failed to cite any case that is remotely analogous to the case here, where an admittedly solvent debtor intentionally refrained from paying its creditors – despite having the capital to do so – and instead litigated on their behalf to

14

their financial detriment.  That is because there is none.  This is a case of first impression, and, therefore, appropriate for an interlocutory appeal.

40. Furthermore, contrary to Debtor's claim, this is both a "particularly difficult" and "exceptional" case.  *(Opp., ¶¶ 51-54, 61)*.  Debtor defines an "exceptional circumstance" as an appeal that "might avoid protracted and expensive litigation." *(Opp., ¶ 42)*.  That is precisely the case here.  A finding by the Second Circuit that the Action did not benefit creditors at the time of the petition would also result in the Action's dismissal.  This dismissal would "avoid a protracted and expensive litigation" which is what Azari, a senior citizen living without her promised pension, has in store for herself at trial and future appeals, even if she prevails.

41. To date, Golsorkhi has engaged in an endless – and "protracted and expensive" – six-year litigation campaign, spanning both state and federal courts, simply to renege on his own affidavit, which he signed freely and without any duress or undue pressure, as the First Department correctly found.   And he has confirmed that all this litigation has nothing to do with the interests of the creditors he is purportedly representing, or with maximizing the estate for them.  This Action is nothing more than a mockery of the bankruptcy court system and Debtor's fiduciary duties as trustee to the creditors it purportedly represents.  As such, this case is not just "exceptional."  It is extraordinary.

## **CONCLUSION**

Based on the foregoing, the Court should grant Defendant-Appellant Azari leave to appeal the Decision to the Second Circuit.

Dated: December 21, 2022
      New York, New York

                                  **BEYS LISTON & MOBARGHA LLP**

By: *Nader Mobargha*
                              Nader Mobargha, Esq.
                              Alison S. Moss, Esq.
                              641 Lexington Avenue, 14th Floor
                              New York, New York 10022
                              Telephone: (646) 755-3603
                              Facsimile: (646) 755-5229
                              Email: nmobargha@blmllp.com
                              *Attorneys for Defendant-Appellant Azadeh Nasser Azari*